**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3500-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CORTNEY BELL, a/k/a
CORTNEY L. BELL,
CORTNEY L. PARNELL,
ANTWAN JOHNSON,
CARLTON W. MINOR, and
COURTNEY L. PARNELL,

    Defendant-Appellant.

_____

Argued December 18, 2024 – Decided June 9, 2025

Before Judge Marczyk, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 21-07-0634.

Rachel Glanz, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Rachel Glanz, of counsel and on the briefs).

Alexis R. Agre, Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

PER CURIAM

On July 23, 2019, police responded to the scene of a reported bank robbery. After DNA evidence connected defendant Cortney Bell to the crime, he was charged, tried before a jury, convicted of first-degree robbery, N.J.S.A. 2C:15-1(a)(2), and sentenced to seventeen years' imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA), to run consecutively to a ten-year sentence defendant was already serving for a separate robbery.

Defendant raises the following arguments on appeal:

POINT I

DEFENDANT WAS DEPRIVED OF HIS RIGHT TO SELF-REPRESENTATION WHEN THE TRIAL COURT [DENIED] HIS REQUEST TO REPRESENT HIMSELF OFFHAND WITHOUT ANY MEANINGFUL CONSIDERATION.

POINT II

DEFENDANT WAS DEPRIVED OF HIS DUE PROCESS AND CONFRONTATION RIGHTS WHEN THE TRIAL COURT REMOVED HIM FROM THE COURTROOM FOR THE REST OF TRIAL.

POINT III

THE MOTION FOR A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED AS THE STATE PRESENTED INSUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT OF FIRST-DEGREE ROBBERY OF EITHER OF THE TELLERS AND INSUFFICIENT EVIDENCE TO CONVICT HIM OF SECOND-DEGREE ROBBERY OF ONE TELLER.

A.  The State Failed To Present Any Evidence From Which A Jury Could Find That [Defendant] Committed Either Degree Of Robbery Against Joseph.

B.  The State Failed To Present Any Evidence From Which A Jury Could Find That [Defendant] Committed First-Degree Robbery Against Shah.

POINT IV

DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE COURT FAILED TO INSTRUCT THE JURY ON MULTIPLE ESSENTIAL ELEMENTS OF ROBBERY AND FAILED TO GIVE A SPECIFIC UNANIMITY INSTRUCTION.

A.  The Court Failed To Instruct On The Second Element Of Robbery And Failed To Explain The Distinction Between First- And Second-Degree Robbery.

B.  The Court Failed To Specify That The Jury Had To Unanimously Agree On The Identity Of The Persons Against Whom The Defendant Committed Various Acts.

3

A-3500-22

<u>POINT V</u>

THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE SENTENCING PROCEEDING WAS REPLETE WITH ERRORS.

A. The Sentencing Court Failed To Provide A Factual Basis For Aggravating Factors Three And Nine, Assign Any Particular Weight To The Aggravating Factors, And Engage In A Proper Balancing Process.

B. The Sentencing Court Did Not Give Sufficient Weight To Mitigating Factor Four, Despite The Credible Evidence That [Defendant]'s Conduct Was Motivated By A Severe Substance Abuse Disorder.

C. The Sentencing Court Failed To Consider The Fairness Of Imposing This Seventeen-Year Sentence Consecutively To A Ten-Year Prison Term [Defendant] Is Currently Serving.

Having considered the record in light of applicable law, we conclude defendant's persistently obstreperous behavior throughout the proceedings warranted the court's denying his mid-trial request to proceed self-represented and ordering defendant's removal from the courtroom during trial. We likewise discern no error in the jury instructions, verdict sheet, or in the court's denying defendant's motion for judgment of acquittal. Although we affirm defendant's conviction, and also conclude the court did not abuse its discretion in determining the term of imprisonment for the robbery, we are constrained to remand for the court to consider the overall fairness of imposing that term

4

consecutively to the sentence he is currently serving in accordance with State v. Torres, 246 N.J. 246, 250 (2021).

I.

A.    The Offense

The trial revealed the following facts.  On the morning of July 23, 2019, four employees were working at the bank in Pemberton Borough, including the branch manager, Rosemary Colon, two bank tellers, Lacey Joseph and Kushal Shah, and a financial advisor Larry Rahn.  Colon and Joseph testified at trial as did bank customer Eric Segars who was also present in the bank with other customers at the time of the robbery that morning.

The three testified that a man entered the bank through doors opening to the parking lot wearing sunglasses and dark clothing, with a sweatshirt hoodie "tied tightly around his face," a scarf covering the lower part of his face and socks on his hands.  Colon and Segars generally described the robber as a black male, in his thirties, approximately five-feet-eight-inches tall or "[m]edium height," but were unable to precisely identify him because of the sunglasses and scarf.  Both Colon and Segars testified the suspect immediately announced his purpose.  Segars indicated that upon entering the bank defendant "demanded the

money," and said "I'm here to rob the bank, I'm coming to steal the money." Colon and Joseph recalled he said, "give me all your money."

Joseph described the man displaying "something in his hood[ie] front pocket that looked as if . . . it could be a gun that was pointed and you could see it protruding from his hood[ie] pocket." Joseph clarified the man "first . . . said, give me all your money, and then the second time he said, give me all your money or I'll shoot." She "fear[ed] that he might injure or kill [her] if [she] didn't do what he said." Joseph and Shah each gave the suspect "bait money," which she described as readily accessible money tellers are trained to provide from their cash drawers in the event of a robbery.

The witnesses described that the man fled to the back door and attempted to exit. Colon explained that after she locked the front door believing the man had left the building, she went to lock the back door and discovered he was still there picking up money that had dropped to the floor. She saw a "dirty Corona [beer] bottle" on the ground, as did Joseph, which she indicated was not there when she came in earlier that day. Segars testified to seeing the man drop the Corona bottle. Unable to exit through the back, the man ran to the front door and fled the building.

6

Police responded and collected evidence including the Corona bottle from which a DNA sample was retrieved. Forensic testing revealed a "full and complete match" of that DNA to a buccal swab later obtained from defendant. The State's expert explained these results met the statistical certainty "threshold of one in seven trillion."

B.    Defendant's Conduct Before and During Trial

After arraignment on charges of first-degree robbery, N.J.S.A. 2C:15-1(a)(2) (count one), and third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (counts two and three),[1] defense counsel was assigned to represent defendant on this indictment, and the pretrial proceedings reflect failed efforts to fashion a global resolution of all defendant's open cases.

Defendant's conduct was addressed at a pre-trial conference held on October 17, 2022, reflecting that the court entered an order to compel defendant's appearance in court due to failures to appear for prior court proceedings.  The court advised defendant of his "right to be present at every

---

[1]  At arraignment, defendant faced several open criminal matters.  He appeared self-represented with standby counsel at his arraignment on this matter.  He was also arraigned on two additional indictments for two separate robberies alleged to have occurred months apart in 2019.  The court also referenced a pending motion to vacate defendant's first-degree robbery plea in a third indictment and an unindicted matter tracking along with the above matters.

portion of the trial," advising that if he failed to appear "the [c]ourt c[ould] and w[ould] try the case in [his] absence." The court noted:

> I don't know whether you refused to come last time. I know you were shouting obscenities at me the time prior to that. That's neither here nor there to me. But I don't know whether you had refused to come. I did sign an order authorizing the Department of Corrections to use whatever reasonable force necessary to have you come here today.

Defendant's disruptive behavior and failures to appear continued, with defendant refusing to return to the courtroom after a short recess during jury selection. Earlier that day, defendant reminded the court of his previous written request for a Wade[2] hearing and raised claims that he was denied an expert and had not reviewed discovery, which the court addressed on the record. The court also explained that it reviewed defendant's written request and concluded "there[ was] no basis in the law for a Wade hearing" because after speaking with counsel, the court understood there would be "no witness [who was] going to come in and point to [defendant]" and identify him as the individual in the robbery. This was confirmed by both the State and defense counsel, and indeed, no witness identified defendant at trial.

---

[2] United States v. Wade, 388 U.S. 218 (1967).

The court denied defense counsel's request that the prospective jurors be dismissed due to defendant's absence from the courtroom. The court cited to defendant's past failures to appear and its prior warnings to defendant about the consequences for his failure to appear. The court afforded defendant the opportunity to attend the next day of jury selection, and, after appearing at the start of the day as the result of the court's "fourth extraction order," the court again advised defendant it had "no issue . . . with this case proceeding without [him] if that's . . . the way [he] want[ed] to go." The court also provided defendant with the instruction it would give should defendant refuse to appear. The court then granted defendant's request to use the bathroom, advising him again that if he "refuse[d] to come back in the courtroom after that, the [c]ourt [would] just . . . continue with jury selection." Defendant again refused to return to the courtroom, and jury selection continued without him.

The court stated on the record, and directed defense counsel to inform defendant of, its "very strong feeling that . . . these actions, . . . delaying the continuation of the trial are purposeful actions by . . . defendant, calculated to delay jury selection . . . . If he absents himself, the trial will continue without him and he'll be bound by the verdict." The court further explained that if defendant persisted in refusing to appear, it would still ensure that defendant

9

was afforded the opportunity to confer with counsel, particularly before cross-examination of the State's witnesses. A sheriff's officer placed on the record that defendant indicated he did not need to use the bathroom; instead he refused to return.

After jury selection concluded and trial was about to commence, the court again ordered defendant's extraction from the jail to a holding cell at the courthouse to afford counsel an opportunity to speak to defendant and allow defendant the opportunity to attend the trial. Counsel placed on the record that he conferred with defendant, "advised him that the jury ha[d] been selected, that openings [we]re going to proceed . . . and that [they would] begin hearing witness testimony," but defendant wanted to remain in the holding cell.

Defendant refused to appear for opening statements or the start of witness testimony, but returned to the courtroom after two witnesses had already finished testifying. Defendant raised claims that the court was "biased towards [him]," and asked for a change of venue, which the court denied, explaining it held no such bias and there was no basis for a transfer. The court also recounted that defendant muttered in the presence of the jury that he was "getting railroaded," and warned, "I'm just telling you, Mr. Bell, if you have any outbursts in court the [c]ourt has the right to have you removed from the

courtroom, which I might very well do."  Despite the admonishment, defendant exclaimed twice in the presence of the jury during the playing of video of the robbery scene, "You can't see where the bottle was dropped."  The court attempted to address defendant who interjected, "My attorney is not helping me. He's not."  The court continued and defendant again interrupted, leading the court to advise, "[T]his is your final admonishment, your final warning."

As the jury reentered the courtroom, defendant asked the court if he could "fire [his] attorney" and represent himself.  The court refused that request, advising "that's not happening.  We've canvassed those issues before, too, some year-plus ago."[3]  Later that day, when a State Police detective began to testify, defendant again interjected, demanding, "Take me to the back."  The sheriff advised him to "[t]ake a seat," and defendant defied the court saying, "No.  No," refusing to comply.

The court then excused the jury, and defendant again asked to fire counsel claiming he had not reviewed discovery, and the court again advised, "[W]e've

---

[3]  The record contains no information about that earlier event. However, the briefs reference a prior matter before the same trial judge in which the judge granted defendant's request to represent himself on a motion to retract a guilty plea.

canvassed th[o]se issues." After numerous warnings, the court ordered defendant's removal for exhibiting "a pattern of obstructionist behavior."

After defense counsel placed on the record his past review of discovery with defendant, the court resumed trial in defendant's absence, employing the process it had outlined allowing counsel to confer with defendant after direct but before cross-examination of each witness.

On the next trial day, defendant was initially present. He claimed that he had taken "a Suboxone drug," which impacted his ability to understand. Based on the events of the prior day of trial, defense counsel moved for a mistrial, highlighting that defendant "was cuffed and his behavior in front of the jury was heard, in [his] belief, by the jurors and could irreparably taint that jury from treating him fairly." After considering applicable legal standards, the court denied the motion, stating "I do not find that declaring a mistrial due to . . . defendant's calculated misconduct in the jury's presence would prevent an obvious failure of justice, and the court will deny the application for those reasons."

After consulting counsel, and with their consent, the court delivered a curative instruction to the jury, twice:

> Yesterday during the trial some of you may have seen
> or heard an outburst and/or disruptive behavior by

12

[defendant].  Any observations of same should not enter into your deliberations in any manner as you decide . . . defendant's guilt on the charges beyond a reasonable doubt.

The court then inquired if any juror would "have any difficulty in following these instructions," and by a show of hands, none indicated any difficulty.

Defendant's behavior deteriorated at this point, and he blurted out a claim that his attorney "threatened [him] with [fifteen] years.  Please help me.  He's a piece of sh[**]," continuing, "I'm in fear of my life. . . .  I want to press charges," requiring the court to again remove him from the courtroom.  Defendant was placed in a holding cell where he was offered the opportunity to consult with defense counsel in preparation of his defense, continuing the court's past practice when defendant was absent from the courtroom.  Defense counsel reported that defendant declined to consult with him, despite these efforts.

Defense counsel moved for a mistrial and, in the alternative, for a curative instruction to be reread to the jury.  The court denied defendant's motion for mistrial, citing again the "volitional" nature of defendant's conduct, but instructed the jury to disregard defendant's outbursts and disruptive behavior during its deliberations.  The jurors again expressed no difficulty in abiding by that instruction.

13

At the close of the State's case, defendant moved for a judgment of acquittal, which the court denied, finding sufficient evidence upon which a jury could find guilt beyond a reasonable doubt of the charged and lesser-included offenses. Defendant elected not to testify on his own behalf or return to the courtroom; accordingly, the court confirmed that "at this juncture, since we've done it repeatedly and [defendant] has determined that he does not want to confer with counsel and does not want to appear again in court," counsel delivered summations, and the court gave the final charge to the jury.

C.    Jury Instructions, Verdict Sheet, and Verdict

After a charge conference in which both parties consented to the court's proposed legal charge, the court read the indictment, read the robbery statute, and instructed the jury largely consistent with the Model Jury Charges, including those for first- and second-degree robbery. The court defined second-degree robbery, stating,

> In order for you to find . . . defendant guilty of robbery, the State is required to prove each of the following elements beyond a reasonable doubt: That . . . defendant was in the course of committing a theft and that while in the course of committing a theft . . . defendant threatened another with or purposely put him or her in fear of immediate bodily injury.

14

The court then defined theft as well as the "purposeful" mens rea required for robbery.

The court explained the definition of deadly weapon and the requirement for first-degree robbery that the State prove "beyond a reasonable doubt [that] . . . defendant not only purposely threatened the immediate use of a deadly weapon, but . . . that . . . defendant purposely engaged in conduct or gestures which would lead a reasonable person to believe . . . defendant possessed a deadly weapon."

The court also summarized the difference between first- and second-degree robbery, and the lesser-included offense of theft from the person:

> To summarize, if you find that the State has not proven beyond a reasonable doubt any one of the elements of the crime of robbery as I[ have] defined it for you, then you must find . . . defendant not guilty.
>
> If you find that the State has proven beyond a reasonable doubt that . . . defendant committed the crime of robbery as I have defined that crime to you but if you find that the State has not proven beyond a reasonable doubt that . . . defendant was armed with, or used or purposely threatened the immediate use of a deadly weapon, or purposely engaged in conduct or gestures which would lead a reasonable person to believe that . . . defendant possessed a deadly weapon at the time of the commission of the robbery, then you must find . . . defendant guilty of robbery in the second degree.

15

If you find that the State has proven beyond a reasonable doubt that . . . defendant committed the crime of robbery and was armed with a deadly weapon or used or threatened immediate use of a deadly weapon or purposely engaged in conduct or gestures which would lead a reasonable person to believe that . . . defendant possessed a deadly weapon at the time of the commission of the robbery, then you must find . . . defendant guilty of robbery in the first degree.

The [c]ourt has included the lesser included offense of theft from the person. . . .

In order for you to find . . . defendant guilty of this offense, the State must prove the following elements beyond a reasonable doubt:  One, that . . . defendant knowingly took or unlawfully exercised control over movable property.  Number two, that the movable property was property of another.  Number three, that the movable property was taken from the person of another, and, four, that . . . defendant's purpose was to deprive the other person of that movable property.

The verdict sheet tracked the instructions:

QUESTION NUMBER ONE:

On the charge of Robbery (first-degree), we find the defendant:

1a.    Not Guilty of Robbery

1b.    Guilty of Robbery

IF YOU FIND THE DEFENDANT GUILTY OF ROBBERY IN QUESTION ONE, SKIP QUESTIONS TWO AND THREE AND MOVE ON TO QUESTION

16

FOUR.

QUESTION NUMBER TWO:

On the charge of Robbery (second-degree), we find the defendant:

1a.     Not Guilty of Robbery

1b.     Guilty of Robbery

IF YOU FIND THE DEFENDANT GUILTY OF ROBBERY IN QUESTION TWO, SKIP QUESTION THREE AND MOVE ON TO QUESTION FOUR.

QUESTION NUMBER THREE:

On the charge of Theft, we find the defendant:

2a.     Not Guilty of Theft

2b.     Guilty of Theft

Despite the standing extraction order, on January 31, 2023, defendant again refused to be present in the courtroom to hear the jury's verdict convicting him of first-degree robbery but acquitting him of terroristic threats.

At the sentencing hearing on June 9, 2023, the court imposed a term of seventeen years subject to NERA, to run consecutively to the ten-year sentence defendant was already serving on an unrelated robbery.

A-3500-22

II.

A.

In his first point, defendant argues the court unlawfully deprived him of his right to self-representation without a meaningful substantive inquiry. The State responds that defendant's conduct in seeking to represent himself was calculated to delay the trial, and to grant the request would have "ignore[d] defendant's continuous pattern of obstreperous behavior." Further, the State contends defendant's demands, untimely made in the middle of trial, are wholly inconsistent with his arguments made on appeal in a prior case in which the trial court allowed him to represent himself.[4]

We review a trial court's denial of a defendant's motion to proceed self-represented for abuse of discretion. State v. Outland, 245 N.J. 494, 507 (2021). We do so mindful of well-settled constitutional considerations.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution grant the criminally accused "both

_____

[4] We granted defendant's appeal of that matter, finding that the court should have first held a hearing to determine if defendant was entitled to a change in appointed counsel before it denied that request and proceeded to allow defendant to represent himself. See State v. Parnell, No. A-3978-21 (App. Div. June 28, 2024) (slip op. at 9-10). We note that there defendant also challenged the court's determination that he was capable of representing himself, but we declined to address that issue having instead remanded for a new hearing on other grounds.

the right to counsel and the right to proceed to trial without counsel." State v. DuBois, 189 N.J. 454, 465 (2007). Indeed, criminal defendants possess "the right to proceed without counsel when they voluntarily and intelligently elect to do so." Ibid. (citing Faretta v. California, 422 U.S. 806, 818 (1975)). "[B]ecause of the importance of trial counsel . . . the courts must indulge in every reasonable presumption against waiver" of the right to counsel. State v. Thomas, 362 N.J. Super. 229, 235 (App. Div. 2003) (citation omitted) (citing State v. Gallagher, 274 N.J. Super. 285, 295 (App. Div. 1994)).

Importantly, the right to proceed self-represented is "not absolute," and "cannot be used to jeopardize the State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts." State v. King, 210 N.J. 2, 18 (2012) (citing State v. McNeil, 405 N.J. Super. 39, 51 (App. Div. 2009)). "[A] defendant cannot 'manipulate the system by wavering between assigned counsel and self-representation.'" State v. Buhl, 269 N.J. Super. 344, 362 (App. Div. 1994) (quoting State v. Crisafi, 128 N.J. 499, 517 (1992)).

Courts generally employ a two-step process in addressing a request to discharge counsel and proceed pro se. See State v. Rose, 458 N.J. Super. 610, 626 (App. Div. 2019). First, the motion must be timely made, "so as not to 'disrupt the criminal calendar, or a trial in progress.'" Ibid. (quoting Buhl, 269

N.J. Super. at 362). Second, the trial court must determine whether a defendant's waiver of his right to counsel "is indeed knowing, voluntary, and intelligent after a searching inquiry that involves advising the defendant of the risks and pitfalls of self-representation." Id. at 627 (citing DuBois, 189 N.J. at 468-69; State v. Figueroa, 186 N.J. 589, 593 (2006); State v. Reddish, 181 N.J. 553, 593-95 (2004); Crisafi, 128 N.J. at 510-12).

The timeliness of a defendant's request to represent himself is a matter for the sound discretion of the trial court, see Buhl, 269 N.J. Super. at 363-64, and "[a] defendant cannot be permitted to place the trial judge in the unenviable dilemma where, in managing the business of the court, he appears to be depriving the accused of his right to self-representation," id. at 363. Thus, "[a] defendant desiring to exercise the right" to represent himself "must do so with reasonable diligence," ibid., as "[t]he right of self-representation is not a license to disrupt the criminal calendar, or a trial in progress," id. at 362. Although no bright line distinction is drawn between pretrial requests and those later raised, timeliness is often defined as a time "before meaningful trial proceedings have begun." Id. at 363.

For example, in State v. Pessolano, 343 N.J. Super. 464, 473 (App. Div. 2001), the defendant had earlier expressed his dissatisfaction with his retained

counsel and had consulted with other attorneys but did not make a motion to adjourn the trial to obtain new counsel until the day of trial. He first made his request to proceed pro se after jury selection and "immediately before opening statements." Ibid. In Pessolano, we concluded that the trial judge did not abuse his discretion in denying the defendant's request. Ibid.

Regarding the second step of the process, the Supreme Court in Crisafi, instructed that

> [t]o ensure that a waiver of counsel is knowing and intelligent, the trial court should inform pro se defendants of the nature of the charges against them, the statutory defenses to those charges, and the possible range of punishment. The colloquy between the court and the defendant will test the defendant's understanding of the implications of the waiver, and will provide appellate courts with an objective basis for review.
>
> In general, the court should also inform defendants of the technical problems they may encounter in acting as their own counsel and of the risks they take if their defense is unsuccessful. Further, the court should inform the defendants that they must conduct their defense in accordance with the relevant rules of criminal procedure and evidence, that a lack of knowledge of law may impair their ability to defend themselves, and that their dual role as attorney and accused might hamper the effectiveness of their defense. Also, the court should explain to the defendants the difficulties in acting as their own counsel and should specifically advise the defendants

21

that it would be unwise not to accept the assistance of counsel.

[128 N.J. at 511-12 (citations omitted).]

Although the Crisafi Court found the trial court did not "engage[] in the necessary colloquy," id. at 512, the Court determined the record demonstrated the defendant's knowing waiver of the right to counsel and his appreciation of the nature of his request to represent himself and had "sought to manipulate the system by wavering between assigned counsel and self-representation and by asserting violations of his right to counsel," emphasizing, "a 'defendant cannot have it both ways,'" id. at 517-18 (quoting State v. McCombs, 81 N.J. 373, 378 (1979)); see also Rose, 458 N.J. Super. at 627 (noting "[i]n rare cases, a court's failure to engage in the necessary colloquy may be excused").

Indeed, both the United States Supreme Court and the New Jersey Supreme Court have long-recognized that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." In re Civ. Commitment of D.Y., 218 N.J. 359, 378 (2014) (quoting Faretta, 422 U.S. at 834 n.46); see also Reddish, 181 N.J. at 597. The right to proceed pro se can be waived when the court has evidence that a defendant is unable and unwilling "to abide by [the] rules of procedure and courtroom protocol." State v. Drew, 383 N.J. Super. 185, 200 (App. Div. 2006)

22

(alteration in original) (quoting Gallagher, 274 N.J. Super. at 297). "In other words, the right to proceed pro se does not provide either 'a license to abuse the dignity of the courtroom' or the right to refuse 'to comply with relevant rules of procedural and substantive law.'" Ibid. (quoting Faretta, 422 U.S. at 834 n.46).

Against this backdrop, we consider defendant's arguments that he was unfairly denied the right to represent himself without the necessary factual inquiry or legal considerations. We recognize the court readily denied defendant's two mid-trial requests to represent himself; but we do not view the court's decision in a vacuum, divorced from the circumstances that precipitated it. Central to our review is the comprehensive record replete with instances of defendant's disruptive conduct and non-compliance with court orders or courtroom protocol.

Specifically as to timeliness, defendant did not make any request to represent himself until after he had repeatedly refused to attend pretrial and trial proceedings despite the court's issuance of extraction orders, jury selection had been completed, and the trial was underway with testimony having been presented from two key witnesses, and defendant had voluntarily absented himself from the proceedings. Although he returned to the courtroom sporadically, he persisted in disrupting or delaying the proceeding. His second

request to represent himself was made even later in the trial, as he simultaneously demanded to be removed from the trial proceedings, demonstrating the contradiction between the nature of his request and the reality of his behavior. The court had already repeatedly found defendant was deliberately attempting to manipulate and disrupt the proceedings by his conduct. In these circumstances, we discern no misuse of discretion in the court's denying defendant's self-representation request, as it was untimely and clearly tethered temporally to defendant's persistent and increasingly obstructive behavior at trial, which had already delayed and impacted the trial.

Because the request was untimely, we need not address the second part of the inquiry; we add only that we are satisfied that defendant's behavior throughout the proceedings provided the necessary record on which to conclude defendant could not comport his behavior in a manner that would not intolerably undermine the order and dignity of the courtroom. At a minimum, the court could have no reasonable expectation that defendant would actually appear to represent himself when he had already refused to appear resulting in numerous "extraction orders" by the court, which still did not secure his appearance in court. Defendant's conduct throughout the proceedings supported the court's conclusion that defendant deliberately engaged in gamesmanship designed to

24

delay and disrupt the proceedings. Such behavior could not support permitting defendant to discharge counsel mid-trial and proceed pro se to further those efforts.

B.

Defendant also claims that the court "deprived [him] of his due process and confrontation rights when the trial court removed him from the courtroom for the rest of the trial." After thoroughly reviewing the pretrial and trial records, we conclude the court did not misapply its discretion in ultimately removing defendant from the courtroom after his last outburst in which he asked to be removed from the courtroom. See State v. Reddy, 137 N.J. Super. 32, 36 (App. Div. 1975) (finding no abuse of discretion after the defendant was removed from a courtroom after engaging in disruptive behavior designed to delay the proceedings).

Criminal defendants are constitutionally guaranteed the right "to be confronted with the witnesses against [them]." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; see also State v. Jackson, 243 N.J. 52, 65 (2020). "The presence of a defendant at his or her own trial is also significant for fourteenth-amendment purposes because the right 'is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence.'" State v. Hudson,

119 N.J. 165, 171 (1990) (quoting <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 107-08 (1934)).

"Typically, presence at trial affords a defendant an opportunity to communicate with counsel, to assist in the preparation of the defense, and to help with cross-examination." <u>State v. Morton</u>, 155 N.J. 383, 436 (1998). However, "a defendant's right to waive his or her presence at trial is clear," <u>id.</u> at 435; <u>see also</u> <u>R.</u> 3:16(b), and a defendant can waive this right without consent "if he behaves 'in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.'" <u>Morton</u>, 155 N.J. at 435 (quoting <u>Illinois v. Allen</u>, 397 U.S. 337, 343 (1970)); <u>see also</u> <u>Snyder</u>, 291 U.S. at 106 (holding that a defendant's Sixth Amendment rights "may be lost by consent or at times even by misconduct"). In <u>Illinois v. Allen</u>, the Court "explicitly" held that "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior." 397 U.S. at 343.

We discern no error in the court's management of defendant's conduct, including the removal of defendant from the proceedings. To the contrary, the record reflects the court's tempered and relentless attempts to manage the uncooperative defendant from the outset of the proceedings and throughout trial.

Defendant initially waived his right to be present at trial by voluntarily refusing to attend jury selection, opening instructions, opening remarks, or the testimony of the first witnesses. See State v. Williams, 219 N.J. 89, 92-93 (2014) (holding that a defendant must demand confrontation or his right will be waived). When he returned to the trial already in progress, due largely to his extraction from the jail by court order after willfully failing to appear, he again deliberately removed himself from the proceedings and refused to return. Defendant was continuously warned both that if he failed to appear, the trial would proceed without him, and that if he appeared and behaved improperly, he would be removed. The court provided numerous opportunities for defendant to conform his conduct, to no avail.

We conclude the court's removal of defendant from trial was appropriate, as defendant waived the right of confrontation with his obstreperous behavior despite repeated warnings. The court persevered in ensuring defendant was able to communicate with counsel, but defendant refused to participate in his defense, rejecting defense counsel's multiple attempts to confer with him during witness testimony. Even then, at the close of the State's case, the court asked defense counsel to "inquire about whether [defendant] want[ed] to participate at all in any other event moving forward." Defendant declined to return and cannot now

27

"have it both ways" and claim a constitutional deprivation wholly attributable to his own deliberate actions.

C.

Defendant further claims the court erroneously denied his motion for acquittal, asserting that the State failed to prove first-degree robbery as to either bank teller.  He contends that, although the State presented sufficient evidence that defendant committed a theft of both Joseph and Shah, the evidence was insufficient to establish (1) with respect to Joseph, that defendant "in the course of committing a theft" against Joseph "threatened or purposely put someone in fear of immediate bodily injury," or (2) with respect to Shah, that Shah actually believed defendant possessed a deadly weapon.  The State responds that "there was ample evidence to support the [first-degree r]obbery charge going forward," as witness testimony indicated that defendant appeared to have a gun and demanded that both tellers give him "all of [the] money."  After de novo review of the trial evidence, we agree that the court properly denied defendant's motion for acquittal at the close of the State's case.

> On a motion for judgment of acquittal, the governing test is:  whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could

28

properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.

[State v. D.A., 191 N.J. 158, 163 (2007); see also State v. Reyes, 50 N.J. 454, 458-59 (1967).]

To prove first-degree robbery, N.J.S.A. 2C:15-1(a)(2) and -1(b), the State was required to prove "in the course of committing a theft," defendant "[t]hreaten[ed] another with or purposely put[] him in fear of immediate bodily injury" and "purposely inflict[ed] or attempt[ed] to inflict serious bodily injury, or [wa]s armed with, or use[d] or threaten[ed] the immediate use of a deadly weapon." Count one charged that defendant "in the course of committing a theft, did threaten another or purposely put another in fear of immediate bodily injury and used or threatened to use a deadly weapon, to wit: [e]mployees and patrons of the TD Bank." We conclude that the record, viewed in its entirety and giving the State the benefit of all favorable inferences, amply supports the first-degree robbery charge.

Based upon the eyewitness testimony of Colon, Joseph, and Segars, and the forensic DNA evidence, it was reasonable for the trial court to conclude that a jury could find that defendant threatened bank employees or purposely put them in fear of immediate bodily injury, armed with the threat of a deadly weapon, in the course of committing a theft.

Joseph's testimony was clear. She explained defendant pointed what appeared to be a gun when he demanded the money and threatened to shoot. She described that defendant first said, "[G]ive me all your money" and then again "said give me all of your money or I'll shoot. And at that point, it looked like he had . . . something in his hood[ie] front pocket that looked as if it . . . could be a gun that was pointed and you could see it protruding from his hood[ie] pocket." She thought the threat "was obviously directed either to [her] or [Shah]," adding, "I'm going to say it was directed to [Shah] because I had already given him money." She reiterated that he gestured as if he had a gun and "he had one of his hands in his pocket almost as if it was pointed. You could see it protruding and pointing as if it was the tip of a gun like pushing out of the fabric." Although Shah did not testify, Joseph's testimony was sufficient to sustain the charge, along with Segars' testimony that upon entering the bank defendant demanded money and announced, "I'm here to rob the bank." Segars testified that defendant dropped the beer bottle from his pocket as he fled the bank. The DNA evidence connected defendant to the bottle.

We are unpersuaded by defendant's attempts to parse out the chronology of events as it pertains to defendant's actions toward each teller during the course of the robbery, which defies the plain language of N.J.S.A. 2C:15-1. Indeed, the

30

robbery statute itself provides that "[a]n act shall be deemed to be included in the phrase 'in the course of committing a theft' if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission." N.J.S.A. 2C:15-1(a). The Court in State v. Mirault, 92 N.J. 492, 500 (1983), clarified that the Criminal Code "broadened the concept of robbery" to include the phrase "in the course of committing a theft," which is defined to include "attempt[s] before and immediate flight after the theft" as a continuous transaction. The evidence amply established the threat to shoot and gestures with the concealed bottle were made in the course of committing a theft.

Further, defendant's attempt to describe the robbery as "[a] mere request for money" is a mischaracterization of the events and contrary to the evidence and testimony presented at trial here. Certainly, "[a] mere request for money, without more, is not criminal," State ex rel. L.W., 333 N.J. Super. 492, 497 (App. Div. 2000); but any such argument here is misplaced and entirely undermined by the record. Defendant's argument ignores Joseph's testimony that she heard the robber state, "give me all your money or I'll shoot" while pointing through his pocket what appeared to be a gun. This testimony was sufficient when taken together with the other evidence to sustain the charge of first-degree robbery.

31

D.

We next consider and reject defendant's challenges to the jury instructions, to which defendant raised no objection at trial.

Defendant argues that the jury instructions contained "fatal errors" and directs this court to essentially two claimed errors: (1) "the instructions omitted an explanation of the second element of robbery and an explanation of the distinction between first- and second-degree robbery"; and (2) the instruction failed to specify that the jury had to unanimously agree on the identity of the victim of the robbery and whether that victim reasonably believed that defendant was armed.

"Importantly, when, as in this case, a defendant does not object to the instructions at trial, we review the jury charge under the plain error standard, which . . . requires reversal only for errors 'of such a nature as to have been clearly capable of producing an unjust result.'" State v. Cotto, 471 N.J. Super. 489, 544 (App. Div. 2022) (quoting State v. Trinidad, 241 N.J. 425, 451 (2020)); see also R. 1:7-2.

> Regarding a jury instruction, "plain error requires demonstration of legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of

itself the error possessed a clear capacity to bring about an unjust result."

[State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006) (internal quotation marks omitted)).]

"Without an objection at the time a jury instruction is given, 'there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case.'" Id. at 320 (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)); see also State v. Scharf, 225 N.J. 547, 581 (2016). "An accused is entitled to assume that the elemental principles governing the accusation against him will be covered in the charge of the court. . . . The right to the instruction is absolute." State v. Butler, 27 N.J. 560, 596 (1958). This includes the requirement that the court must advise the jury of factors that distinguish one degree of crime from another. See, e.g., State v. Federico, 103 N.J. 169, 176 (1986) (where the jury instruction failed to distinguish first- and second-degree kidnapping and the Court "recognize[d] that the failure to charge the jury on an element of an offense is presumed to be prejudicial error, even in the absence of a request by defense counsel").

Here, we review for plain error, as not only was there no objection to the challenged instruction, both counsel agreed to the form and substance of the final charge at the charging conference. Having reviewed the charge as a whole, we find the court's instructions sufficiently encompassed the necessary components of the applicable Model Jury Charges for first- and second-degree robbery and do not warrant reversal. We do not discern that any deviation from the model charge altered the necessary legal instructions regarding the elements of each offense or possessed the capacity to bring about an unjust result.

Here the jury was twice correctly advised of the elements of second-degree robbery, specifically, that the State was required to prove beyond a reasonable doubt each of the following elements: "[t]hat . . . defendant was in the course of committing a theft and that while in the course of committing a theft . . . defendant threatened another with or purposely put him or her in fear of immediate bodily injury." The court also instructed on first-degree robbery and all of its elements. The court then instructed that if the State failed to prove the elements of robbery, the jury was required to find defendant not guilty. It continued by instructing that if, however, the jury found the State had proven the elements of robbery, but failed to prove "beyond a reasonable doubt that . . . defendant was armed with, or used or purposely threatened the

immediate use of a deadly weapon, or purposely engaged in conduct or gestures which would lead a reasonable person to believe that . . . defendant possessed a deadly weapon at the time of the commission of the robbery," it was required to "find . . . defendant guilty of robbery in the second degree."

Importantly, the court correctly instructed that only if the jury found that the State established "beyond a reasonable doubt that . . . defendant committed the crime of robbery and was armed with a deadly weapon or used or threatened immediate use of a deadly weapon or purposely engaged in conduct or gestures which would lead a reasonable person to believe that . . . defendant possessed a deadly weapon at the time of the commission of the robbery," could it "find . . . defendant guilty of robbery in the first degree."

Taken together with the remainder of the instructions and the verdict sheet that clearly delineated between first-degree robbery and the lesser-included offense of second-degree robbery, we discern no plain error arising from the court's robbery instructions.

We similarly review for plain error defendant's claim that the court failed to provide a unanimity charge requiring the jury to agree regarding the victims of the robbery thereby inviting jury confusion. The State responds that it presented one clear and simple theory of the case with one act of violence by

defendant against "the employees and patrons of the bank," which was properly considered by the jury without confusion or questions.

A jury must reach a unanimous verdict in a criminal case. See N.J. Const. art. I, ¶ 9; R. 1:8-9. To be unanimous, jurors must "'be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." State v. Macchia, 253 N.J. 232, 252 (2023) (quoting State v. Frisby, 174 N.J. 583, 596 (2002)). "Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict." State v. Cagno, 211 N.J. 488, 516 (2012) (quoting State v. Parker, 124 N.J. 628, 641 (1991)). On request, a defendant may seek a specific unanimity instruction when "it appears that a genuine possibility of jury confusion exists or that a conviction may occur as a result of different jurors concluding that a defendant committed conceptually distinct acts." Parker, 124 N.J. at 641. "Although [a unanimity] charge should be granted on request, in the absence of a specific request, the failure so to charge does not necessarily constitute reversible error." Id. at 637.

The Court has provided examples of circumstances when a general instruction is insufficient, which include:

> (1) a single crime could be proven by different theories supported by different evidence, and there is a

> reasonable likelihood that all jurors will not unanimously agree that the defendant's guilt was proven by the same theory; (2) the underlying facts are very complex; (3) the allegations of one count are either contradictory or marginally related to each other; (4) the indictment and proof at trial varies; or (5) there is strong evidence of jury confusion.
>
> [Cagno, 211 N.J. at 517 (citing Frisby, 174 N.J. at 597); see also Parker, 124 N.J. at 635-36.]

Considering defendant's arguments, we conclude that the evidence at trial reflected defendant engaged in one course of conduct and threat directed at the tellers. We detect none other than a singular theory advanced by the State and perceive no alternate circumstances upon which the jury could derive another basis for culpability.

These were not complex facts. Here, the State presented straightforward eyewitness evidence that defendant committed the first-degree robbery by entering the bank, masked and demanding money, and approached the tellers commanding, "give me all your money," "give me all your money or I'll shoot." As described by Joseph, he held in his pocket and pointed what appeared to be a gun, later revealed to be a beer bottle concealed to simulate a handgun. There was no debate that defendant's statements and conduct occurred while in the course of committing a theft, and caused both tellers to do as commanded and turn over their money. Joseph explained she believed he possessed a gun and

feared for her life.

The jury made no inquiries that would hint at misunderstanding or confusion. Thus, defendant's reliance on State v. Gentry, 183 N.J. 30 (2005) is misplaced. See id. (involving the defendant's distinctly different acts against different victims at different times during a robbery and the jury's specific indication of confusion). Here, particularly as defendant never raised this issue before the trial court or objected in any manner, we are satisfied the absence of a unanimity instruction did not create the capacity to bring about an unjust result.

E.

In his final point, defendant challenges his sentence, arguing the court failed to properly evaluate and weigh the sentencing factors, imposed an excessive sentence, and improperly imposed this sentence consecutively to the sentence he was already serving without properly considering the fairness of that combined sentence under Torres, 246 N.J. at 268. He specifically argues that the court failed to consider his addiction at the root of his criminal acts, claiming his "conduct was motivated by a severe substance abuse disorder," and his sentence was imposed "without any explicit balancing of the aggravating and mitigating factors." He further submits that "both robberies 'were meant to fuel and to fund . . . a heroin habit that had altered his decision making,'" and that

38                                                                    A-3500-22

his use of a dirty beer bottle is evidence that he had no intention of hurting anyone. He claims his addiction should have been more heavily factored into the sentence, in particular the length of the sentence and the consecutive term.

The State argues that because "[d]efendant had four indictable convictions prior to this conviction," a "record [that] spanned several states," and "experienced fines, prison and probation," "defendant's actions cannot be justified by . . . his addiction." The State also contends that "defendant's sentence . . . does not shock the judicial conscience," and is therefore not an abuse of discretion.

We review the court's sentencing determination for abuse of discretion. See State v. Blackmon, 202 N.J. 283, 297 (2010). "[S]entencing is a holistic endeavor." Torres, 246 N.J. at 272. On review, we must ensure that any aggravating or mitigating factors found by the trial judge under N.J.S.A. 2C:44-1 are based upon sufficient credible evidence in the record, see State v. Miller, 205 N.J. 109, 127 (2011); and when the factors found by the trial court are so grounded, we must affirm even if we would have reached another result, see State v. O'Donnell, 117 N.J. 210, 215 (1989).

At sentencing, the State sought application of aggravating factors three (the "risk that the defendant will commit another offense," N.J.S.A. 2C:44-

1(a)(3)), six (the "extent of the defendant's prior criminal record and the seriousness of the offenses of which" he was convicted, N.J.S.A. 2C:44-1(a)(6)), and nine (the "need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9)). Defense counsel argued that mitigating factor one (the "defendant's conduct neither caused nor threatened serious harm," N.J.S.A. 2C:44-1(b)(1)), and four ("substantial grounds tending to excuse or justify the defendant's conduct," N.J.S.A. 2C:44-1(b)(4)), applied.

Here, defendant requested the court sentence him to fifteen years' imprisonment subject to NERA, concurrent to the term he was serving, and the State sought, and the court imposed, a seventeen-year term to run consecutively. The court found aggravating factors three, six, and nine, and mitigating factor four, to which it did not ascribe great weight.

The court indicated there was a risk defendant would commit another offense, and in finding factor six pertaining to defendant's history, it noted having sentenced defendant on the robbery for which he was presently incarcerated. The court also found the need to deter this defendant and others. The court rejected defendant's argument that the court should apply mitigating factor one, finding that "although there was an acquittal on the terroristic threats charge, . . . [defendant] was convicted of first-degree robbery, which by

definition is a violent crime," and further determined that "the victims considered it a threat of serious harm."

In finding mitigating factor four, the court addressed defendant's addiction, stating it did not "disbelieve that . . . perhaps one of the main motivating factors here and in the prior instance was attempting to secure funds to . . . continue to use in the context of [defendant's] substance abuse issue," but explained that it did not "weigh that particularly heavily."

The court explained that it weighed the aggravating and mitigating factors and "appl[ied] the considerations outlined in the relevant case law," and imposed the seventeen-year sentence which was within the statutory range, though not at the top of it.[5] Because the court's findings were grounded in the record, we will not disturb the sentencing term.

As to the consecutive sentencing, we are not persuaded that the court's weighing of the Yarbough[6] factors in favor of consecutive sentencing was an error. The court found the crimes were "separate crimes[,] involving multiple

---

[5] We note the State moved but withdrew its application to sentence defendant to an extended term based upon his four prior indictable convictions. If granted, defendant would have been exposed to an increased range between twenty years and life imprisonment.

[6] State v. Yarbough, 100 N.J. 627 (1985).

victims," "committed at different times," in "separate places," and were not so close in time as to be part of "a single period of [aberrant] behavior." These findings were sound and addressed the <u>Yarbough</u> factors directly.

The court, however, did not place on the record its findings as to the "'fairness of the overall sentence'" when run consecutively to the ten-year term defendant was already serving, which is "'a necessary feature in any <u>Yarbough</u> analysis.'" <u>Torres</u>, 246 N.J. at 270 (first quoting <u>State v. Miller</u>, 108 N.J. 12, 122 (1987); and then quoting <u>State v. Cuff</u>, 239 N.J. 321, 252 (2019)). We therefore remand for the court to evaluate the overall fairness of the sentence as guided by <u>Torres</u>.

Affirmed in part, and remanded in part for proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3500-22